WILLIAM C. BARNEY'S ADMRX.' *v.* QUAKER OATS COMPANY.

May Term, 1911.

Present: ROWELL, C. J., MUNSON, WATSON, HASELTON, AND POWERS, JJ.

Opinion filed January 20, 1912.

*Master and Servant—Injuries to Servant—Dust Explosion in Ele-*
*vator—Dust Collectors—Burden of Proof—Evidence—Weight*
*and Sufficiency—Relevancy—Materiality and Competency—*
*Similarity of Conditions—Assume Risk—Negative Evidence—*
*Self-serving Declarations—Findings of Fact—Conclusiveness—*
*Competency of Experts—Hypothetical Questions—Facts As-*
*sumed—Questions for Jury—Safe Place—Master's Negligence*
*—Contributory Negligence—Extraordinary Risk—Witnesses—*
*Redirect Examination—Argument of Counsel—Opening Ar-*
*gument Continued by Second Counsel—Unbriefed Exceptions.*

In an action for damages for the death of defendant's servant from an al-
leged extraordinary risk, plaintiff has the burden of showing that de-
ceased lost his life because of defendant's negligence, and that deceased
neither assumed the risk nor was guilty of contributory negligence.

The mere fact that one does not tell something is not evidence that he does
not know it.

In an action for damages for the death of defendant's engineer from an
explosion of dust in defendant's grain elevator and grinding mill,
where plaintiff had the burden of showing deceased's ignorance of the
danger of such explosion, as bearing on that issue evidence was admissible
that deceased did not mention that danger to his wife, in whom he con-
fided a great deal in respect of his business and his troubles, nor to close
acquaintances with whom he had talked about his duties and his em-
ployment, and that, though he warned his son, when working in the
elevator, of other dangers, he never mentioned the danger of dust
explosion.

In considering circumstantial evidence, weight should be given to the united
force of all the circumstances, and so, in reviewing a ruling admitting
such evidence, each piece stands as it would if it had been received
under a fulfilled offer to show all that was ultimately shown.

In an action for damages for the death of defendant's engineer from an explosion of dust in defendant's grain elevator and grinding mill, where plaintiff had the burden of showing deceased's ignorance of the danger of such explosion, as bearing on that issue evidence was admissible that deceased, in comparing his former employment as a locomotive engineer with his employment in the elevator, said that the latter was less dangerous; and that statement was not a self-serving declaration, as it was not offered for the purpose of proving the fact that it recited, and, if true, was unfavorable to plaintiff.

In connection with such negative testimony tending to show that deceased was ignorant of the explosive character of the dust, testimony of his fellow servants that they had never been warned, or heard others warned, of that danger was admissible on the issue of deceased's lack of such warning or notice.

Negative evidence should not be received in behalf of a party having the burden of proving a negative, where at most such evidence affords a mere basis for speculation and conjecture, and not ground for a reasonable inference.

In an action for damages for the death of defendant's servant from an explosion of dust in defendant's grain elevator and grinding mill, testimony that witness, when the explosion occurred, saw a woman, with her clothing and hair burned and who afterwards died of her injuries, going from the northwest corner of the elevator, was admissible as tending to show that the woman was within the explosive wave, the direction of which was material on the question of the origin of the explosion.

In an action for damages for the death of defendant's servant from the explosion of dust in a grain elevator, there was testimony that seventeen persons were killed, and testimony as to many details of horror relating to the appearance of the explosion, the identification and burial of bodies, and that after the explosion a woman, with her clothing and hair burned, was seen going from the elevator. *Held*, that the admission of further testimony that after the explosion a woman was seen who looked "cooked," that she was afire, and died the next morning, was not objectionable, in view of the other testimony, as prejudicing the jury by a needless account of the horrors of the explosion.

In an action for damages for death from the explosion of dust in a building that was used as a grain elevator and grinding mill, a witness who had for twenty years installed in elevators a dust collector that he had patented, and which he testified would prevent explosions, was properly allowed further to testify as to whether he had given his exclusive attention to installing his own dust collector, as such testimony related to dust in plants of the same general character as the one in question, and bore on his qualifications as an expert.

In an action for damages for the death of a servant from the explosion of dust in a grain elevator and grinding mill, an expert witness who had

testified as to the explosive nature of such dust, and as to the prevention of such explosions by use of a dust collector, was properly allowed further to testify as to the main object of a dust collecting system patented and extensively installed by himself.

In an action for damages for the death of a servant from the explosion of dust in a grain elevator and grinding mill, testimony of an expert as to whether there is danger from such dust as an explosive was material.

The finding of the trial court that a witness is competent as an expert is not reviewable, where that finding is fairly and reasonably supported by the evidence.

In an action for damages for the death of a servant from the explosion of dust in a grain elevator and grinding mill, where the evidence showed that the same danger of explosion would exist if the air were filled with dust, regardless of whether the building was used as a mere grain elevator, or as an elevator and grinding mill, or whether the dust came wholly from unground grain, an expert witness was properly allowed to state all the conditions that cause an explosion.

An unresponsive answer is properly allowed to stand, if it is material to the issues.

In an action for damages for the death of a servant from the explosion of dust in a grain elevator and grinding mill, testimony of an expert that fire caused an explosion because of the suspension of dust in the air contiguous to the fire, and that the dust in the air must be in a mixed condition to result in an explosion, was material and competent.

Where the deposition of an expert witness as a whole tended to show that defendant was negligent in not using some dust collecting system in its combined elevator and grinding mill, the deponent's further testimony that his dust collecting system operated so as to avoid the explosion of dust that exists in such plants was admissible.

In an action for damages for the death of a servant from the explosion of dust in a grain elevator and grinding mill, where the deposition of an expert witness as a whole tended to show that a system of dust collecting was extensively used in such plants as defendant's and effective to prevent the danger of dust explosion, so that the neglect of defendant to use such a system was a shortage of legal duty, the deponent's further testimony as to how his dust collecting system operated so as to avoid explosions and as to the general use of similar dust collecting systems and their effectiveness in avoiding explosions, was admissible.

Testimony that a great deal of dust had accumulated in defendant's combined grain elevator and grinding mill, and was floating in the atmosphere thereof; that in such a plant it was practicable to supply a dust collecting system according to the machinery used and the points at which the dust originated; and that the prevention of dust avoids the danger of explosion, was admissible in view of other testimony tending to show that the same conditions existed in buildings used solely as grain

elevators, and that in them dust collecting systems are effective to eliminate the dust.

Expert testimony as to the installment, use, and effectiveness of a particular system of dust collectors was admissible in view of the witness's testimony as to other systems and their use and effect, and the court's statement that defendant was not bound to use any particular system.

An expert on dust collectors in grain elevators having described the operation and effect of his own dust collecting system, which in principle was the same as all other systems, and his testimony tending to show that his system, or other such systems, could have been effectively used in defendant's combined grain elevator and grinding mill, the witness was properly allowed further to testify that there were dust collecting systems similar to his, and that he knew of only two systems on the market used in grain elevators.

Defendant, on cross-examination of plaintiff's expert witness on dust collectors in grain elevators, and in an attempt to show deceased's probable knowledge of the danger of such dust to explode, and so his assumption of the risk of explosion, elicited that dust collecting systems were in common, effective, and long continued use in grain elevators in the part of the country where witness lived, and then asked witness whether the danger was not a matter of common knowledge to owners and employees. The witness answered that it was commonly known to owners. *Held*, that it was proper to allow witness to be asked on redirect examination whether the danger was commonly known to employees.

Nothing to the contrary appearing, it is presumed that the dust resulting from handling ground cereals is not essentially different from the dust arising from like cereals in the process of grinding, or in their handling before grinding.

In an action for damages for the death of defendant's servant from the explosion of dust in a combined grain elevator and grinding mill, evidence examined, and *held* sufficient to warrant the inference that the heated condition of a bin of "shives" fifteen days before the explosion continued till the explosion, so as to warrant the assumption of that continuance as a basis of hypothetical questions to an expert as to probable spontaneous combustion.

In an action for damages for the death of defendant's servant from an explosion of dust in a combined grain elevator and grinding mill, evidence considered, and *held* that the questions of whether defendant was negligent in failing to use one of the dust collecting systems, well and long known and in practical use for eliminating dust and preventing explosions, and whether deceased was guilty of contributory negligence, were for the jury.

Dangerous conditions in a work or business, which can be obviated by the use of practical devices well known and in common use, are not "inevitable."

The explosive character of dust when combined with the atmosphere of a grain elevator is not a condition "visible" to one who is ignorant of the danger of an explosion from that combination, although he may see the dust in the air.

Where one of plaintiff's counsel made the opening argument, and at its close defendant stated that it did not wish to reply or to argue the case, it was within the discretion of the trial court, and not an abuse thereof, to allow another counsel for plaintiff to continue the argument already made, the court giving defendant an opportunity to reply when plaintiff's second counsel had finished.

The court properly refused to instruct the jury that an ordinary risk "is a risk that exists by reason of the conduct of the business as it is carried on continuously from day to day, its normal conduct with the way of carrying on the business, and that conduct fully known to the servant when he engages in it," since the word "normal" involves an element of an extraordinary risk and the assumption thereof.

Exceptions not briefed are treated as waived.

CASE for negligence. Plea, the general issue. Trial by jury at the March Term, 1910, Franklin County, *Taylor*, J., presiding. Verdict and judgment for the plaintiff. The defendant excepted. The opinion fully states the case.

*G. F. Ladd, R. E. Brown* and *W. B. C. Stickney* for the defendant.

The testimony of the several witnesses that deceased had never mentioned to them the danger from dust explosion was inadmissible. *Hatch* v. *Reynolds' Est.*, 80 Vt. 294; *Morgan* v. *Hendrick*, 80 Vt. 284.

*C. G. Austin & Sons, J. W. Redmond* and *Max L. Powell* for the plaintiff.

The risk from the explosive character of this dust was an extraordinary one, and deceased should have been notified of it. 1 Labatt's Master & Servant, §240, note 1; *Illinois Steel Co.* v. *Ryske*, 102 Ill. App. 347; Judgment affirmed, 65 N. E. 734, 200 Ill. 280; *Pittsburg etc. Co.* v. *Adams*, 105 Ind. 165; *Western Union Tel. Co.* v. *Mullen*, 32 L. R. A. 351; *Deisenreiter* v. *Kraus-Merkel Malting Co.*, 92 Wis. 164; *Co-Op. Tel. Co.* v. *St. Clair*, 94 C. C. A. 109; *Williams* v. *Walton*, 32 Atl.

726; *Kligel* v. *Aitken*, 35 L. R. A. 249; *Louisville etc. Co.* v. *Shivell*, 13 Ky. L. Rep. 902.

The failure of the deceased to tell his wife, his son, and the other witnesses of the danger from the risk of the dust to explode, in the circumstances, tended to show his ignorance of that danger, and so was admissible. "It is a general principle of evidence that a failure by a party to assert a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact. Wig. Ev. §1042." *Coolidge Tr.* v. *Ayers*, 77 Vt. 448; *Bank* v. *Drennan*, 71 Vt. 289; *Fenno* v. *Weston*, 31 Vt. 345; *Pond* v. *Pond's Est.*, 79 Vt. 352; *Vail* v. *Strong*, 10 Vt. 457; *Felton* v. *Chellis et al.*, 81 Vt. 10; 1 Labatt, Master & Servant, §§383, 290; *Southern Pacific Co.* v. *Seley*, 162 U. S. 145; *Lunberg* v. *Glenwood Lumber Co.*, 49 L. R. A. 33.

HASELTON, J. This is a case for alleged negligence on the part of the defendant, resulting in the death, October 7, 1908, of the plaintiff's intestate, William C. Barney. The action is brought for the benefit of his widow and the next of kin. The deceased left a widow, who as administratrix is the plaintiff, and five minor children. The case was tried upon an amended declaration which was met by the general issue. A verdict for the plaintiff was returned, and judgment was rendered thereon. The defendant excepted.

The defendant is a corporation, organized under the laws of New Jersey, with its main office in Chicago. At the date just named it was operating at Richford, in this State, a plant called in the proceedings below "The Elevator." This consisted of a building of about these dimensions: Length 130 feet, width 90 feet, height 154 feet. The plant included an engine house, not connected with the main building, and also flour sheds. The whole plant was used in the manufacture of mixed feed for horses and cattle. In this business the main building was used in part as a grain elevator for the storage of whole grain, in part as a grinding mill, and in part for the storage of the by-products of other plants operated by the defendant in various places, and in part for the mixing of the finished products of the business. Five-sixths of the material

which entered into the finished products came to the plant ground and prepared for mixing. The defendant had operated the plant from January, 1903, down to October 7, 1908, the date already stated as that of the accident in question.

The plaintiff's testimony tended to show that, of the material brought to the plant already ground, much was ground very fine, some of it not so fine, and that some of it had the coarseness of the hulls of oats; that this material was brought to the plant sometimes in bulk and sometimes in bags or sacks, and that, in transferring it to storage bins, it had to be shoveled or emptied into places on the ground floor, from which it was carried by the elevating process to storage bins in the upper part of the main building, and that from these bins the material had to be transferred by various processes to mixing tanks; that the handling of this material caused the air in the different parts of the plant to be filled with large but varying quantities of fine dust whenever the plant was in operation, the density of the dust at any given time depending upon the amount of the material that was in process of handling. The plaintiff's evidence also tended to show that during the time that the deceased was employed by the defendant, as will hereafter be stated, there came to the plant large quantities of corn, oats and barley in bulk, which were handled in the same manner as the material already referred to, and that, in the transfer of this grain, dust, that was mingled with it, was distributed through the atmosphere of the main building or "elevator," as it was called, on trial, and as we will call it, for it was that, though something more; that, just before the accident in question, three car loads of barley had been so unloaded, that the elevator was equipped with stones and rollers for grinding whole grain, and that such grain was, almost every day, ground in the elevator building. The plaintiff's evidence further tended to show that the dust lodged several inches deep on rafters, beams and other exposed surfaces, that beneath some parts of the floor the dust had accumulated to a depth of several feet, that there was no provision for collecting the dust, and no method, except sweeping, used for its removal, that a jar of the building would cause accumulated dust to be shaken from its lodgment and distributed through the air, and that the jar from grinding would

do that; that dust was thick in the air during the unloading of barley.

It appeared that the deceased had been in the employ of the defendant during all the time that it had operated the plant, and that he had worked in the plant about six years before the defendant operated it, and that the conditions as to dust were practically the same during the whole time of his employment. The main building was originally an elevator of the Canadian Pacific Railway Company, but had passed out of the hands of that company, by lease or otherwise, before the defendant was employed therein. The elevator equipment appeared to be unimpaired and in regular use though the original number of tall bins, upwards of 60 feet in height, had been reduced from about 77 to about 65 in number, and grinding and mixing appliances had been put in.

The deceased acted as engineer for the defendant; he had charge of an electric lighting system throughout the plant, he also had charge of, inspected and repaired, a steam heating system and the water pipes throughout the entire plant and all machinery used in the entire plant. His duties in these regards obliged him to make, and he did make, daily visits to all parts of the elevator, and he was fully acquainted with all the described conditions existing therein. At the time of his death he was fifty-two years of age, was of more than ordinary intelligence, was fairly well educated, and was well posted in matters of general interest.

October 7, 1908, between the hours of four and five in the afternoon, while the plant was in operation, and while the deceased was in the line of his duty, an explosion occurred in the elevator building, fire followed, and that building and portions of the adjacent buildings were thereby consumed. At the time of the explosion the deceased was in the elevator and then and there lost his life.

The claim of the plaintiff was that the explosion which killed her husband resulted from the accumulation of large quantities of dust through the defendant's elevator building, already referred to; that the defendant was negligent in allowing the accumulation of dust and in not utilizing devices in known practical use for eliminating the dust from the air and thereby

removing the danger of explosion; that the intestate was killed in encountering an extraordinary risk which he did not assume, and that he was without fault on his part.

The plaintiff's testimony tended to show that the dust, when lying in piles, would, if set fire to, burn without exploding, but that when it was diffused through the air in the building it was liable at any time to explode, if fire came in contact with the intermingled air and dust, and that the explosion in question probably resulted from fire produced by the spontaneous combustion of some of the fine material, before described and known as "shives," which the plaintiff's evidence tended to show "had become hot enough to steam or smoke and approximated the point of ignition fifteen days before the explosion."

The defendant introduced no testimony, but claimed that upon the evidence in the case such risk as there was, was an ordinary incident of the business; that the accumulation of dust was inseparable from the conduct of the business; that there was no evidence tending to show that there was any device known which would prevent the conditions which existed at the time of the accident. The defendant further claimed that if the risk resulted from the negligence of the defendant, and so was extraordinary, it was one which the plaintiff assumed.

The plaintiff introduced certain evidence on the ground that it tended to show that the decedent had not been informed of and did not understand and appreciate the dangerous condition resulting from the dust in the air of the defendant's plant. This evidence consisted in part of testimony of witnesses that they never heard him say anything as to the dangerous character of the dust.

Carl Barney, a minor son and a school boy, testified to the effect that his father was kind to the children and thoughtful about their education and anxious and careful as to their safety; that his father talked with him a good deal and confided in him in matters pertaining to the affairs of the father and the affairs of the boy; that his father gave him advice, and advised him to work in the elevator on vacations and Saturdays, as he did until he got a job in the office of the defendant; that he began work in the elevator when the Quaker Oats Company

took possession of it, and that his work was in the elevator until he entered upon office work in 1907, and that after that he did work in the elevator, off and on, when business was slack in the office; that his father cautioned him not to enter the bins for fear of falling off a ladder, and cautioned him to keep away from moving machinery, but that his father never said anything to him about danger from the dust in the mill, and that he never heard his father say anything to anybody about such danger.

Mrs. Barney, the widow and plaintiff, testified to the effect that the decedent was very anxious about the welfare of the children and especially about that of Carl, the oldest, who was seventeen at the time of the accident; that her husband confided in her a great deal about his business; that if anything worried him or troubled him he would speak to her about it and ask her advice; that he was a careful and anxious man, that he never said anything to her about any danger from the elevator dust nor about any danger in his work at the elevator, further than to say to her that he felt that he was safer where he was than he would be in his former occupation as a railroad man.

Homer Whitman, testified that he was superintendent of the power plant of the Sweat-Comings Company at Richford; that he had lived at Richford about twenty-two years; that he had at different times done work in the elevator in question in the way of wiring; that he was well acquainted with Mr. Barney and taught the latter to run the dynamo in the defendant's plant and had occasion to know how well he was posted, and talked with him about mechanics, and things pertaining to engineering and mechanics; that his own business was that of a stationary engineer; that he was formerly a railroad man as Mr. Barney had been; that Mr. Barney told him that he would rather stay where he was than drive a locomotive because there was less danger where he was, and that neither in that conversation nor at any time did Mr. Barney make any reference to any danger incident to the dust in the elevator, but that Mr. Barney, at one time, asked him the voltage of the dynamo to know if there was any danger from that.

Charles Garvin, a resident of Richford, who had worked a year or so for the Quaker Oats Company, but was not in their employ at the time of the accident, testified that he had known

Mr. Barney about twenty years; that he was fireman for him for about eight months, and that he took charge of the engine in Mr. Barney's absence; that in his work he was largely subject to Mr. Barney's directions, and that he and Mr. Barney were on very familiar terms. In cross-examination he testified that Mr. Barney was rather more than ordinarily intelligent, a man that seemed to be well informed on general topics, well posted on matters of general interest. Following this cross-examination the witness was allowed to testify in re-direct examination that he never heard Mr. Barney say anything in any way as to the dangerous quality of the dust, and never heard him talk on that subject-matter.

Much of the evidence above referred to was merely introductory in its character and was not objected to. But the defendant undertook to object and except to the evidence which it was claimed tended to show that the decedent did not know of the danger inhering in the dusty condition of the atmosphere in the elevator. In some instances an available exception was not in fact taken, but objections and exceptions were properly made and taken in enough instances to give the defendant the benefit of all its claims regarding the matter now under consideration.

The burden was on the plaintiff to show not only that the decedent lost his life because of the defendant's negligence and because of an extraordinary risk, but also to show that, if this was so, the extraordinary risk was not assumed by the decedent, and to show that the decedent had not that knowledge which is an essential ingredient of assumption of risk. It was upon this negative proposition that the evidence in question was offered, and the real question about it is whether the evidence, taken together, tended to show lack of such knowledge, and whether any of it taken in connection with the rest was immaterial or so remote as to be inadmissible as matter of law. For the evidence having been admitted, each piece of the testimony stands as it would stand had it been received under an offer made and fulfilled to show all that was shown.

The naked fact that one does not tell something is not evidence that he does not know it. *Goss* v. *Burt*, 84 Vt. 52, 78 Atl. 120; *Camp* v. *Averill*, 54 Vt. 320; *Hatch* v. *Reynolds'*

*Estate*, 80 Vt. 294, 67 Atl. 816.   But the principle of these cases is not determinative of the question here.

A man out of consideration for his wife might well keep from her the fact that he was working in a place of great peril. But the evidence here tends to show that the decedent was accustomed to talk with his wife about things that worried him and caused him anxiety.   A man might well conceal from a favorite son the fact that the latter was working in circumstances of great peril, if a disclosure of the circumstances would not aid the son in averting the peril; but here there was no particular danger in the dust unless fire was brought in contact with it, and it seems almost incredible that a man who was what our Canadian neighbors call "a good father of a family," and who was thoughtful enough to caution his boy against danger from machinery and from climbing ladders, would, except from ignorance, fail to caution his boy against the danger of dust explosion from having any fire around or from lighting anything in a place where fire would be likely to cause a destructive explosion of dust.   Not to caution a boy in this regard would be much like allowing a child, ignorant of the explosive character of gunpowder, to handle it with no caution against lighting it.

The testimony to the effect that Mr. Barney said nothing to Homer Whitman about danger of an explosion of dust is given point by the fact that he and Mr. Whitman, both formerly railroad men, talked together about mechanics and things pertaining thereto; that Mr. Barney spoke to Mr. Whitman about the question of the danger from the dynamo, and spoke, in a comparative way, of the danger or lack of danger in his occupation.

Such is the association of ideas, that in these conversations Mr. Barney's mind must have been brought to the very danger of dust explosion, if he knew of that danger, and his silence about it would in such case have been somewhat unnatural in view of what he in fact did say.

The testimony of Charles Garvin, the intimate friend of Mr. Barney and for some time his associate in work, that he never heard the latter say anything about any danger from the dust was, in itself, less strong as testimony than that of the

other witnesses referred to; but, in view of the intimacy of the two men and the fact that they talked together enough so that, as the defendant's cross-examination tended to show, Mr. Garvin was able to determine that Mr. Barney was well informed on general topics, well posted on matters of general interest, some weight attaches to the testimony of this witness that he never heard Mr. Barney say anything about the one topic which was of vital interest to both.

The testimony that we have .reviewed, taken together, tended to show that Mr. Barney was ignorant of the danger of dust explosion, and each part of it was admissible, for, what he might maintain silence about, under motives that would actuate him in one case, he might speak about, when the circumstances or motives or both were changed; and, taken together, the evidence of what he did not say, considering his relations to the witnesses who gave the evidence and their opportunities, his talk on kindred subjects, his mental and moral character, as the evidence tended to show it, was negative evidence that he neither knew nor believed that the dust was an explosive.

As was said by Lord Cairns, in the Belhaven and Stanton Peerage Case, 1 App. Cas. 278, "in dealing with circumstantial evidence we have to consider the weight which is to be given to the united force of all the circumstances put together." Much the same thing was observed by Judge Mattocks in *Richardson* v. *Turnpike Co.*, 6 Vt. 496, and the nature of proof by circumstantial evidence, as an inductive process requiring great latitude in the reception of evidence of subordinate facts, is clearly stated and applied in *State* v. *Ryder*, 80 Vt. 422, 68 Atl. 652.

The evidence that, in comparing his former employment as a railroad engineer with his employment by the defendant, the decedent said that there was less danger where he was, was particularly objected to on the ground that it was a self-serving declaration. But it was not a self-serving declaration; for if the declaration made was true it was unfavorable to the plaintiff, and it was not offered as evidence of the facts declared. The bearing of the evidence was in its tendency to show the decedent's state of mind, that he didn't have knowledge of the subject he was talking about, and that what he said, without

more, was unnatural, if in fact, he knew of the explosive character of the dust in which he was working from day to day. The question of self-serving declarations is not involved, and we will not further discuss the question of what the law treats as such declarations.

If, however, the intestate had in fact been told or notified of the real character of the dust as an explosive, evidence that he gave no sign of knowledge on that subject would have had little or no weight. Here, in endeavoring to make out a *prima facie* case of ignorance on his part of an extraordinary danger, that is of a danger due to the defendant's negligence, the plaintiff, under objection and exception, introduced some further evidence now briefly referred to.

Charles Garvin, one of the witnesses who testified that he never heard Mr. Barney say anything about the dangerous quality of the dust, also testified that he never knew of the Quaker Oats Company, or any of its representatives, giving those who worked there any warning or notice as to the dust; that he never knew of any warning of any kind being given Mr. Barney or any of the employees in that regard, and that he never heard any one talk in the presence and hearing of Mr. Barney on the subject of danger from dust. The length of time during which the witness was himself an employee of the company, the extent of his association with Mr. Barney in their common employment in the defendant's plant, the degree of the intimacy or friendship between the witness and Mr. Barney, and the length of their acquaintance, have already been referred to.

Joseph Fountain testified in behalf of the plaintiff that he went to work in the elevator in September, 1906, and was working there at the time of the accident, October 7, 1908, that, in the meantime, he had been away about six or seven months; that at the time of the accident he had been at work for the defendant continuously for about eight months. He testified that during the time he was working there he never heard any notice of any kind of the danger from the dust given to Mr. Barney, and further that he never knew of any warning or notice of danger from the dust given by the company or its representatives to any of the employees. His testimony was that his work was that of an all-around man. It didn't appear that

he was, to any extent, thrown in contact with Mr. Barney, though he testified that he used to see him in the elevator every day; and such force as his testimony has lies mainly in its tendency to show that Mr. Barney didn't get notice of the danger of an explosion of dust through any general notice to the employees.

In endeavoring to make out a *prima facie* case of the non-assumption of an extraordinary risk, and with the burden on that question resting upon the plaintiff as it does in this State, the course pursued by the plaintiff was a proper one under the circumstances, and such evidence as she introduced as to lack of warning or notice was admissible in connection with the testimony, previously referred to, tending to show that he was without knowledge with respect to the explosive character of the dust.

It is claimed that the evidence already considered, divided into two classes, though governed by the same general principle, had no other tendency than to show what the witnesses had not heard, and had no tendency to negative knowledge on his part of the facts about which they had not heard him speak, and of which they had not heard him informed. But the rule permitting negative evidence of this sort was well established at common law and has many illustrations. Evidence that one has searched for and cannot find a writing may tend, not merely to show the search and failure of discovery, but to show that the instrument does not exist. Evidence that a person has for a certain time been absent and not heard from by those with whom he would naturally communicate may tend to show, not merely that the person has been absent and not heard from, but that he is dead. These and other illustrations of the rule, or rules, in question are given by Professor Wigmore. 1 Wig. §664.

Where the question was whether premises standing in the name of a husband belonged in fact to his wife, a witness, who for a long time had been a member of the family, was allowed to testify that he had never heard the husband claim to own the property; and this testimony was held to be admissible, particularly since it was connected with other testimony. *Donovan* v. *Selinas*, 85 Vt. 80, 81 Atl. 235.

And in *Comstock's Admr.* v. *Jacobs*, 84 Vt. 277, 78 Atl. 1017, the defendant's wife being asked if she had ever heard either of two persons, who had lived in the family, give her husband any direction as to property claimed to have been turned over by them to him, and the evidence having been excluded, it was held by this Court that it should have been received, since the situation of the witness with reference to the parties was such that a negative answer would have had some tendency to show that no such direction was given.

So too in *Carpenter* v. *Central Vermont Ry. Co.*, 84 Vt. 538, 80 Atl. 657, negative testimony of witnesses that they had never heard anything said in their vicinity indicative of ill feeling against the defendant was held to be proper evidence tending to show that no such feeling existed.

In *Lincoln* v. *Hemenway*, 80 Vt. 530, 69 Atl. 153, it was material to determine whether the plaintiff fell from a bicycle and so received an injury in April of a certain year or not until as late as August of the same year. On this question it was held not to be error for the court to receive testimony from a neighbor and long-time acquaintance to the effect that she did not hear of the injury until the latter part of August. The doctrine of probabilities was explained and applied.

In *State* v. *Phair*, 48 Vt. 366, the respondent, as an important element of his defence, claimed that he attended a circus at Brandon on a certain day and rode from Brandon to Rutland on the midnight train. A witness testified that he was acquainted with Phair, attended the circus in question, and rode from Brandon to Rutland on that midnight train and did not see Phair. His evidence was held admissible as tending to show, not merely that the witness didn't see Phair, but that Phair was not at Brandon on the day in question as he claimed. This Court held that the only question about this evidence concerned its weight, and that that was for the jury to determine.

Such testimony should not be received where, at most, it affords a mere basis for speculation and conjecture and not ground for a reasonable probability; but here the testimony which we have reviewed fairly and reasonably tended to make out a *prima facie* case in favor of the plaintiff in respect to her contention that the intestate did not know of and did not assume

the risk of injury or death in consequence of a dangerous condition of dust which other testimony in the case tended to show existed by reason of the negligence of the defendant.

The plaintiff called as a witness one Oswald Vincent. According to his testimony he unloaded the three loads of barley, already referred to, just before the explosion, had got onto one of the empty cars which were being shunted out, and was outside of the elevator and facing it, when the explosion occurred. He gave a pretty full narrative of what he saw. He immediately jumped off the car on which he had been and ran in a northerly direction. He was asked if he saw anybody going in the same general direction. This question was asked under an offer to show that he saw a woman, who afterwards died from the injury, going from the northwest corner of the building with her clothing blown off and her hair afire, as tending to show the direction of the explosive wave, and so by inference to show where the explosion started. Under objection and exception the witness answered that the first person he saw was his brother who was coming from lighting his switch lights in the yard of the Canadian Pacific Railroad. This answer was obviously unexpected and immaterial, and it is equally obvious that it was harmless. The witness then testified, under objection and exception, that upon turning around he saw a woman in the field west of the elevator, that she looked "cooked," that she was afire, that her clothes were about her knees, that he cut them off, and that she died the next morning. As to this testimony, counsel for the plaintiff claimed that it was admissible as tending to show that the woman was within the explosive wave, the direction of which it was material to show upon the question of the origin of the explosion, and referred to testimony already in the case tending to show that a person who was standing at a different corner of the building was merely thrown against a pile of lumber, but not so as to stun him or to pervent his getting up and going away. We think the evidence was admissible for the purpose for which it was offered. The condition of the woman tended to show that she had been enveloped by the explosive wave, and her position and the direction in which she was going had some tendency to show the direction of the explosive wave, which expert testimony tended to show

would aid in the location of the fire that was the occasion of the disaster.   There were some details that were, perhaps, not strictly necessary, but the objection was to the whole narrative and was simply for immateriality.   The defendant, in its brief, insists that this evidence was introduced solely for the purpose of prejudicing the jurors by a needless account of the horrors of the accident.   This idea was not suggested below, but mere immateriality was there relied on; and we do not think that the horror of the matter there occurred to counsel as a reason for the exclusion of evidence; for, as matter of fact, before this evidence was introduced a witness had testified that seventeen persons were killed in the explosion, fifteen employees of the defendant company, and two others who were women. The defendant had made no objection to this testimony.   There were numerous details of great horror relating to the appearance of the explosion, the partial identification and the burial of something as the remains of Mr. Barney, and incidentally of the digging out of bones and bodies.   In fact before this witness testified another witness, one Wilson, had told of seeing the explosion and of seeing a woman,  with her clothing and hair burned off, a little way from the elevator going north.   All this was without objection; and it is clear enough that the objection to Vincent's testimony, on account of any unnecessary horror about it, was not thought of below, and that the details of horror, which were either necessary or given without objection were such that a word or two more or less could not have been prejudicial.

The plaintiff introduced the deposition of Henry L. Day, who testified in direct examination that his business is the manufacture of Dust Collectors and Dust Collecting Systems; that he has been in that business for twenty years or more and that his place of business is in Minneapolis; that the nature and object of his system depends on the kind of a plant in which the system is installed, whether an elevator plant or some other plant; that in an elevator plant the object of his system is to collect and handle the dust from the various points in the elevator where the dust originates or accumulates; that his business requires him to be conversant with elevators and to have a knowledge as to their construction; that he is the patentee of

a system known as the Day System and president of the Day Company; that the number of dust collecting systems which he has installed runs up into the hundreds; that practically all of the terminal houses in Minneapolis are equipped with his system; that he has made a study of the handling of dust and the keeping of a grain elevator clean from dust; that his system, as equipped, does not go into flour mills but into grain elevators, and that it is the dust of grain elevators that it handles and has to do with; that his study has primarily related to the handling of that dust rather than to the causes of fires and the effect of fires on such dust, but that, in his study, he has formed definite conclusions as to the cause of explosions by dust; that miller's dust is dust that originates in a mill where grain is manufactured into flour or some finished product; that his experience has not led him into contact to a great extent with mills; that his experience and study have related to the handling of dust rather than to the cause of it; that he has, however, studied into the effect, as an explosive, of the dust that collects in elevators and in mills; that the main object of his system is to handle and remove the dust from grain elevators; that there is danger from such dust as an explosive; that the existence of dust in a grain elevator on the floors and timbers and wherever it may settle is a menace in case of fire, because the fire is very likely to cause an explosion if the air in the elevator is permeated with dust to any extent; that in a grain elevator where the dust is permitted to settle on the floors and timbers and elsewhere, the air, if the elevator is in operation, is thoroughly permeated with dust and that, in consequence, if there is a fire, there is almost sure to be an explosion; that the fire causes the explosion because of the suspension of the dust in the air contiguous to the fire; that the dust and air must be in a mixed condition and that there must be a fire in order to an explosion. The witness explained how his dust collector system operates in a grain elevator, and that the adaptation and application of the system depends in a particular case upon the equipment of the particular elevator; that in a building which is an elevator and a grinding mill combined it is quite practicable to provide a dust collecting system adapted to the situation. The witness

testified that there are dust collecting machines besides his but similar in plan and purpose.

In cross-examination the witness testified, responsively to questions, that his dust collecting systems, hundreds in number, had been installed from the Atlantic to the Rocky Mountains and from Canada to the Gulf of Mexico, in elevators scattered over nearly the whole of the United States, that he installed many of them years ago; that other systems besides his are used quite extensively, and that he had studied the problem of removing dust very thoroughly; that whether dust is explosive or not depends upon the nature of the dust; that in a planing mill the shavings would be too coarse to explode, but that very finely divided particles of any combustible material, in suspension in the air, would explode if set afire; that dust in a grinding mill or elevator would not explode until ignited; that he came to make a study of the matter of removing dust from grain elevators and grinding mills, because for a number of years he was located in the flouring mill district of Minneapolis, and was engaged in work in the flour mills there; that a good many years ago there were dust explosions in mills in Minneapolis; that it was then a matter of common knowledge that an elevator might blow up as the result of an explosion of dust; that it had been a matter of common knowledge for many years that dust in a grain elevator and grinding mill would cause an explosion; that for many years the apparatus in both mill and elevator equipment has aimed at the prevention and removal of an accumulation of dust; that wherever he had installed his systems it was a matter of common knowledge on the part of the owners of grinding mills and grain elevators that dust in such plants is liable to explode; that investigations with reference to such explosions and their causes had been made many years ago; that if an elevator without a dust collecting system, and not in operation, should explode, the cause of the explosion would be determined by the origin of the fire and the recency of the operation of the elevator; that anything that will ignite the combination of air and dust will, in his opinion, cause an explosion; that where his system is installed in an elevator or grinding mill the floors must be swept up with a broom, that the floor sweeps are not automatic but that the other parts of

the system are; that anything that would prevent the accumulation of dust would prevent the danger of explosion; that the removal of the dust in any way would answer the purpose. The witness explained in further cross-examination the method of installing his system in an elevator where there is grinding done, and testified that he thought that the danger of an explosion is reduced as the amount of dust in the air is reduced. His redirect examination educed nothing new except upon one point, and that will be separately referred to.

During this examination the witness was asked in behalf of the plaintiff if, during his twenty years' experience, already referred to, he had given his exclusive attention to installing the Day Dust Collector in elevators and grain mills and in buildings of that order. To this question the defendant objected on the ground that it was leading, and on the ground that it was immaterial and incompetent because it did not relate to the kind of dust complained of in this case and to the kind of plant that this was. The objection for form is not relied on. The other objections were overruled, and properly, for the question did relate to dust and plants of the same general character as that of the dust and plant in question here, as indicated by the testimony, and the answer, read under exception, was fairly responsive, so far as it went, and, in any view, both the question and answer were directed to the qualifications of the witness as an expert.

The witness was asked to state the main object of his dust collector system and his answer has in substance been given. The question and answer were objected to for immateriality and incompetency on the grounds just stated. The court allowed the question and answer to be read under exception. In view of the whole testimony of the witness as narrated it was not only proper, but eminently fair, that the witness should state the main object of his dust collector system. The objection was properly overruled.

Another question asked the witness was: "Is there any danger from this dust as an explosive?" The question was objected to for immateriality and incompetency and on the ground that the witness was not qualified to testify as an expert upon the subject. The evidence was material and competent

and the court found that he was qualified to answer. Such a finding is not reviewable if there is any fair and reasonable ground for it, and the abstract which we have given of this deposition shows that there was such ground.

Another question put to the witness was: "You may state how this dust must be handled or what must be its state when it explodes basing your answer upon your experience and investigation of this very subject?" The witness said: "You mean the state or the condition," and the examiner added: "Yes, the entire condition that causes the explosion." These questions were objected to on the grounds already considered and because not directed to the kind of dust complained of. For reasons already stated these objections were properly overruled. By way of answer the witness gave the testimony already recited, that the very existence of dust in a grain elevator on floors, timber and elsewhere is a menace in case of fire. The answer was objected to on the grounds that it was not responsive, and because it did not apply to the dust complained of in this action. The court overruled the objection and the defendant excepted. We think the answer was sufficiently responsive to a part of the question. But if not responsive it was admissible for it was material. The building in question was, in great part, an elevator, and the testimony of the witness tended to show that the same dangers would exist if the air in the building was filled with dust, whether the building was an elevator in whole or only in part, and whether or not the dust came wholly from uncrushed grain.

The witness was asked with regard to the dust: "Why and how is it a menace?" This question was objected to on the grounds of the objections to the questions previously considered. He was allowed to answer under exception and was then asked to explain a little more in detail. This question was not specifically objected to, but, as it asked for a further answer to a previous question, we treat the objection to that question as covering this. The questions were admissible for reasons already stated. In answer to these questions the witness gave the explanation which has been embodied in a connected form in the statement of his testimony already referred to. The answer was read under objection and exception

but in connection with the other part of the deposition it was admissible.

The witness was asked why the fire causes an explosion, and answered that it was because of the suspension of dust in the air contiguous to the fire. This testimony was read under objection and exception on the grounds already noted. For reasons already given the testimony was relevant and admissible.

The witness was also asked a question in response to which he gave the testimony, already referred to, that the dust and air must be in a mixed condition to result in an explosion. This was read under objection and exception, the objections being those previously considered, and held to be without merit.

The witness was asked how this Day Dust Collecting System operates so as to avoid the explosion of dust which is liable to originate in mills. The answer, which was somewhat long, was objected to on various grounds; but the question and answer were allowed to be read under objection and exception. One of the objections was that the answer was not responsive. In the answer, the witness, in terms, referred to the operation of his system in grain elevators and particularly in elevators where grain-cleaning machines are used. The answer was not altogether responsive, but it was a clear explanation of the adaptability of his system to different conditions and of how it operates by suction to accumulate dust from the various points to which the connections extend, and to deliver it at any desired destination. One objection was that the testimony didn't tend to show negligence on the part of the defendant in not using the Day System. But the testimony was a material part of a deposition which tended to show that the defendant was negligent in not using some dust collecting system, and that all dust collecting systems in practical use operate on the same general plan. One objection was that the law didn't compel the defendant to use any system. But the defendant's own cross-examination tended to show such wide-spread, general, long continued and effective use of the Day System or a similar system of dust collecting and such danger from the permeation with dust of the air of a building used in whole or in part as a grain elevator, that it tended to show that the defendant neglected a legal duty in not using a well-known practical device.

in general and long-continued use for eliminating or reducing. the 'danger from that source. The testimony was further objected to because it related to a place and condition different from those in question. It is claimed in argument that the answer has not the slightest reference to the question of how this system, or like systems, could be used in the plant in question in connection with the business therein carried on. But the foregoing recital of the substance of the deposition meets all of these objections except the one that the answer was not responsive. And since, so far as it was not responsive it was material, it was properly read.

The witness was asked if it was impracticable to use his dust collecting system in an elevator building that has been equipped for grinding grains to be used for making feed for horses and cattle. He replied that in such a building as that, or in such a plant as that, it is quite practicable to supply a dust collecting system according to the machinery used and the points at which dust may originate. The question was objected to on the ground that the witness wasn't qualified to answer it, and upon the ground that it didn't apply to the kind of building and the kind of business under consideration. The court permitted the question and answer to be read and the defendant excepted. In permitting the reading of the testimony the court tacitly found that the witness was qualified and this finding is not revisable for the evidence fairly and reasonably tended to sustain it. The other objection was groundless for reasons already stated.

The defendant objected to the question which brought out the testimony already recited that if you prevent the accumulation of dust in an elevator you avoid the danger of explosion. The answer was also objected to. The question and the answer were read and an exception was taken. The first objection was that the witness was not qualified to give an opinion upon the subject; but, since his testimony tended to show that he was, and the court below, in ruling as it did, is to be deemed to have found that he was, this objection requires no special attention. The other objection to the question and answer was that they applied solely to an elevator. But the deposition as a whole and other testimony in the case tended to show the

same conditions as to dust in an elevator used solely as such, and in one used in part as this was.

The witness was asked for a more direct answer on the point last considered, and the question was objected to for the further reasons that the defendant wasn't bound to use any particular system and that the witness was not qualified to answer. The court overruled the objection, and an exception was taken. These objections have already been considered; but we note that at this point the court below expressly found that the witness was qualified, and pointed out that its rulings didn't go upon the ground that the defendant was bound to use any particular system, and called attention to the force and character of the deposition as a whole. The exception was properly overruled.

The defendant objected and excepted to the reading of the testimony of the witness that certain evidence he had given in his deposition was the result of his twenty years' experience. Counsel for the defence seem to have thought that, in referring to his twenty years' experience, he had in mind only some of the testimony which was not allowed to be read; but in this we think they were incorrect.

The witness testified that there were dust collecting systems similar to his, working upon the same general plan and with the same general purpose as his; that he knew of only two dust collectors on the market used in grain elevators, "The Cyclone Collector" and the "Day Collector," that a dust collector is simply a part of a dust collecting system. This testimony was read under objection and exception, the objection being that it didn't appear that there were other dust collecting systems that could be used in a plant of the kind under consideration, or where there is carried on the kind of business carried on by the defendant. But the description of the defendant's plant and business which we have given, and the description which the witness gave of the nature and operation and adaptability of his dust collecting system, the principle of which he said was common to all the dust collecting systems referred to, tended to show that his system and others could be used in the defendant's plant, and so this evidence was properly read to the jury.

We come now to the matter of the redirect examination which it has been said would receive separate consideration. In such redirect-examination the witness was asked: "Do you think that the ordinary employees of an elevator would know the danger from this accumulation of dust and the scientific reason for that danger?" The witness responded to the first part of the question and said: "I don't think that the average employee knows of the danger under which he is working." This question was objected to as immaterial and incompetent and not the subject of expert opinion. The objection was overruled in view of the cross-examination that had preceded the question, and the defendant excepted. In cross-examination, apparently with a view to showing that the decedent must have had the knowledge which is an essential element of the assumption of an extraordinary risk, the defendant had introduced the evidence already referred to as to the common and long continued use of dust collectors in elevators and mills, and that in the regions referred to it was matter of common knowledge that dust in grinding mills and elevators is liable to explode, and had asked if there was not such common knowledge on the part of the owners of mills "and employees." The witness had, however, limited his answer to the common knowledge of the owners of mills. The question objected to in redirect examination was, it will be seen, a part of a question which the defendant's counsel had asked in cross-examination. in endeavoring to establish their claim with reference to the assumption of risk. Having itself opened up the matter, and, in substance, asked the very question under consideration, the defendant cannot complain because, it not having got the answer it wanted, the court permitted the plaintiff in redirect examination to inquire on the same point. *Lewis* v. *Crane*, 78 Vt. 216, 62 Atl. 60; *Titus* v. *Gage*, 70 Vt. 13, 39 Atl. 246; *Chamberlain* v. *Fuller*, 59 Vt. 247, 9 Atl. 832; *Lytle* v. *Bond's Estate*, 40 Vt. 618.

As the witness said nothing about knowledge of a scientific reason for the danger from accumulation of dust, that element of the question need not be considered.

In arguing the exceptions to different parts of the deposition of Mr. Day, the defendant more than once calls attention.

to the fact that the question under consideration didn't disclose to the witness that five-sixths of the material handled in the elevator came there already ground. We call attention to the fact that the objections didn't disclose to the court this specific ground of objection. But, not to dispose of the matter on a technicality, it is to be taken, nothing to the contrary appearing, that the dust arising from handling ground cereals is not essentially different in its character from the dust arising from like cereals in the process of grinding, or in their handling before grinding. We do not think that the testimony of Mr. Day was vitiated because of any lack of applicability to the conditions existing in the defendant's elevator, but, on the contrary, it was applicable to such conditions there as the plaintiff's evidence tended to show.

The plaintiff called as a witness, H. M. Bell, superintendent of the Robin Hood plant at Swanton, whose testimony tended to show that he is a chemist, and an expert upon explosives, in consequence of both study and experience, and that he had specially observed and studied the matter of explosions from dust. His testimony was to the effect that he had manufactured very many of the high explosives, and his explanation of an explosion was instructive. He explained what spontaneous combustion is, and how that might take place in a complex cellulose substance of the character of the shives spoken of in this case. He qualified as an expert in the matter of explosives and spontaneous combustion.

Before this expert was called John Marchand had testified that he worked at the elevator for a year or so and up to a time about fifteen days before the explosion; that he was laid off from work at that time on account of a shut down of the machinery; that before he quit he was at work one day trying to start a bin of shives; that he pulled the slide at the bottom of the bin, but that nothing came out through the bin, which other testimony tended to show was sixty or seventy feet high and was full; that he tried to start the shives by using an iron poker but that he couldn't make headway with that, getting very little out in that way; that he then cut a hole into the side of the bevel of the bin on the west side about three feet from the bottom of the bin; that two boys then helped him; that he then

got an iron rod twelve or thirteen feet long and sharpened, and that he and the boys punched through the hole with that; that at first they couldn't start the shives in that way, but that finally they got some of the material out; that before they finished work they had removed enough material so that their rod reached up into the bin about twleve feet on one side; that the material was so hard that they couldn't stick the pointed rod into it further than six or seven inches at a time; that their method was to stick the rod in and then wiggle it around; that he put an electric light up inside the hole they had made and saw steam up in the opening; that he took some of the loosened material into his hands and that it felt hot, "awful hot," and that it steamed when it was squeezed; that when he put his face up to the opening he felt hot air on his face; that the material smelled different than it did when it was cool; that the end of the iron rod that was worked around in the shives got hot after ten or twelve minutes.

These things, testified to by the witness Marchand, and a description of the building and of the dimensions and shape of the bin, as the testimony tended to show them, were assumed as the basis of a hypothetical question put to the expert Bell, and he was asked to state, assuming the truth of the hypothesis, what in his opinion was the condition of the material in the bin. The witness was allowed to answer this question under objection and exception, the only gound of objection relied on being that the evidence didn't tend to show that any such conditions as were assumed existed at the time of the accident. The witness replied that the conditions stated to him in the question indicated that the shives in the bin approximated the point of ignition. He explained the reasons for his answer at some length and very clearly.

The expert, for the court found him to be such on adequate testimony, was then asked a question which assumed the conditions described in the previous question and some further things as to the composition of the shives and was inquired of as to his opinion, on the assumption made, of the probability that the material would become incandescent at any time. This question was answered under objection and exception on the ground that the evidence didn't tend to show that any

such condition as the question assumed existed in any bin in the defendant's plant, about, at or near the time of the explosion. The witness answered that there was no doubt that the material as described would reach the point of ignition. The expert was then asked what, with the conditions previously assumed, would be the effect·of letting air into the space in the bottom of the bin. This question was answered under objection and exception but the objection raised no new question, being the same as that made to the questions already recited.

The defendant, in its brief, treats these three exceptions as one, and in one part of its brief contends that there is nothing in the evidence tending to show that any bin of shives was in the condition assumed in the hypothetical questions at any time later than fifteen days before the explosion, and that the answers of the witnesses do not tend to show that such condition of the bin of shives could have produced the explosion at the time it occurred.

The conditions assumed were what the evidence tended to show existed about fifteen days before the explosion. No question is made about that; and these conditions, and the testimony with reference to them, tended to show that ignition or spontaneous combustion was then imminent. The witness Marchand testified that the shives had been in this bin all the time he had been there, almost a year; that the bin was full of shives which hadn't been moved in that time; that after finishing the work on the bin of shives, as before narrated, he was laid off because the engines couldn't be run on account of low water; that that was about three or four days after the work, in endeavoring to start or move the shives, was done; that the shives in question remained in the bin when he left; that there was a general shut down of the plant, and that all of the men but four were laid off; that the plant had started up again about three days before the explosion. The evidence tended to show that the shives were used only in making molac, and that after the plant was started up no molac was made until the day of the explosion, and that it was in process of making at the time of the explosion. The evidence tended to show that it would have been impracticable to have moved the shives

from the enormous bin in which they were during the shut down
of the machinery needed for their transfer.

The evidence as to the course of the principal or primary
explosive wave, as explained by expert testimony, tended to
locate the fire which started the explosion, and somewhat aided
the other evidence just recited in giving rise to a reasonable
probability that the explosion of the dust resulted from fire
communicated to it by spontaneous combustion in the shives;
and so there was evidence tending to show that the conditions
of the shives which indicated impending combustion about
fifteen days before the explosion, continued, except as it developed
the crisis, and started the fire which caused the explosion. The
testimony in that regard was not matter for mere speculation
and conjecture but it was testimony from which logical inference
might be drawn. The bill of exceptions states that it appeared
from the plaintiff's testimony that the explosion probably oc-
curred from the spontaneous combustion of shives, and while
this statement does not conclude us, for the transcript is made
controlling, it is a fair statement of the tendency of the plaintiff's
evidence. Besides, the exceptor's own brief, in that part of it
devoted to a statement of the case, admits that this was the
tendency of the plaintiff's testimony. The brief in treating
of this matter, does not, as in some places, state what the plain-
tiff claimed for her evidence, but it states what appeared from
the evidence as the probable cause of the explosion. In view
of the tendency of the plaintiff's testimony as we read it, as
the court below understood it, and as the defendant itself in
one part of its brief states it to have been, there was no error
pointed out or relied upon or that occurs to us, in permitting the
expert Bell, to answer the questions referred to.

This evidence, tending to show that the explosion was
started by spontaneous combustion in a bin of shives, was not
introduced for the purpose of showing negligence on the part
of the defendant, but for the purpose of showing the occasion
of the explosion of the dust, which, as the plaintiff's evidence
tended to show, permeated the air of the elevator in consequence
of the negligence of the defendant. The plaintiff apparently
felt that she had the burden of showing *prima facie* that her
husband did not start the fire himself, and while the course

of the trial seems to indicate that she was thought to be over-cautious on this point, it fell out that she was not, for, as we shall hereafter see, at the close of the evidence the defendant made the very point that a verdict should be directed in its favor on the ground that there was no evidence in the case tending to show that the intestate did not himself start the fire that caused the explosion.

As has been said, the defendant introduced no evidence, but at the close of the plantiff's evidence moved that a verdict be directed in its favor. The motion was overruled and the defendant excepted. There were eleven grounds of this motion all of which were considered by the court below, and the defendant in its brief says that the motion should have been granted upon each of these grounds.

The first of the grounds was that the evidence fails to show actionable negligence on the part of the defendant. However, in discussing exceptions to the evidence, we have pointed out that there was evidence tending to show that the defendant was negligent in failing to use appliances well and long known and in general and practical use for removing and preventing a dangerous accumulation of the explosive dust.

The second ground was that there was no evidence tending to show that the conditions in the elevator (and the defendant here uses the word "elevator") were not the natural and inevitable conditions of the business conducted by the defendant. But conditions which can be obviated by the use of practical devices well known and in general use are not inevitable, and so this claim as to the tendency of the evidence was not sound.

The third ground of the motion was that, on all the evidence, the condition of the air and dust in the elevator (and the word "elevator" is the defendant's own) was the natural and inevitable result of the unloading of ground feed and grain in the usual course of the business, and that there was no evidence tending to show that the condition could have been avoided by the exercise of the care of a prudent man conducting such a business as the defendant's was. This claim had already been considered and held to be groundless.

The fourth ground of the motion was that on all the evidence the plaintiff's intestate knew all the conditions existing in the

elevator (the word "elevator" being here also the defendant's own) and voluntarily remained at work, and the fifth ground was that there was no evidence that the intestate did not know of the danger of the conditions under which he worked. But while the intestate must be taken to have known of the dusty condition in the elevator, there was, as we have seen, evidence tending to show that he did not know of the explosive character of the dust in combination with the air; and that that was one of the conditions existing and under which he worked. So this ground, or these grounds, of the motion could not prevail.

The sixth ground of the motion was that there was no evidence tending to show that the intestate was free from contributory negligence, and the seventh was that there was no evidence that the intestate did not contribute to the happening of the accident by some act of his own, and the ninth was because there was no evidence that the intestate did not start the fire causing the explosion.

The testimony tended to show that every one who was actually inside the elevator at the moment of the explosion was killed; and so it was, of course, impossible to introduce direct evidence of what the plaintiff was doing at that precise instant. But one witness, Joseph Fountain, testified that he saw Mr. Barney in the elevator about five minutes before the explosion tending a valve that required attention in the process of manufacture then going on, and in answer to questions put to him in cross-examination this witness testified that Mr. Barney was not smoking; that he did not have any light in his hand; that the witness did not see any light or anything about, didn't see anything in Mr. Barney's hand or around him. The witness testified that he saw Mr. Barney on the afternoon of the explosion three or four times in the same place attending to the valve. But more than all else, the evidence which we have already reviewed, tending to show that spontaneous combustion of the shives started the fire which was the occasion of the explosion, tended to exclude the theory that Mr. Barney started the fire which was the occasion of the explosion; just as the evidence tending to show that the Maine was blown up in one way renders it improbable that that battleship was blown up in a different way; just as evidence tending to show

that a person has been murdered tends to show that he did not commit suicide; just as·death by drowning excludes the idea of death by hanging.   Except for a few rules of exclusion, the rules of evidence which obtain in courts of law are the same as those by which men of good sense are everywhere and always guided in their reasoning processes.

The argument of the defendant's counsel does not suggest how the intestate could have caused the explosion except by starting a fire, and the court was entirely right in declining to direct a verdict for the defendant on the ground that  there was no  evidence tending to show freedom from contributory negligence on the part of Mr. Barney.

The eighth ground of the motion asserts, or re-asserts, the claim that the air in this mill was necessarily permeated by the dust, and that the danger from an explosion there was an ordinary incident to working in such a place.  But this claim, like one already referred to, disregards the effect ·of the expert evidence and needs no further consideration.

The tenth ground of the motion is that the conditions existing in the mill on the day of the accident were the "normal, usual and visible conditions" that had existed there during the entire time that the intestate had worked for the defendant. It is enough to say with regard to this ground of the motion that the explosive character of dust combined with air is not a condition "visible" to one who does not know of the danger of explosion from such combination, although he may see the dust in the air.

The eleventh ground of the motion is the same in substance as the tenth except  that it adds the claim that there is no evidence tending to show  that the defendant's feed-mixing business could have been conducted without creating the existing condition.   In considering this claim it is unnecessary to review the testimony already  referred to tending to show that the dust had been negligently allowed to collect and pile up wherever it could find lodgment, nor to the testimony as to the. practicability and the effect of the introduction  of a dust collecting system known for many years and in general and practical use for many years throughout the country.  This ground of the motion ignored the evidence and it was properly overruled.

Mr. Austin, one of the plaintiff's counsel, made the opening argument for his client.    When he closed, counsel for the defendant stated that they did not wish to reply or to argue the case to the jury.    Thereupon Mr. Redmond, of counsel for the plaintiff, asked the court in its discretion to allow him to argue the case in continuation of the argument already made.    The court, as matter of discretion, acceded to the request, and Mr. Redmond proceeded with the argument.    When it was finished the court stated to the defendant's counsel that they might reply, but they did not, and said: "We have waived our right." To the ruling allowing Mr. Redmond to proceed with the opening argument the defendant excepted.    The matter was within the discretion of the court, and since the defendant's counsel were given full opportunity to reply there was no abuse of that discretion.    *Bolton* v. *Ovitt*, 80 Vt. 362, 389, 67 Atl. 881; *Blaisdell* v. *Davis*, 72 Vt. 295, 304, 48 Atl. 14.

Defendant's counsel had waived no ight to reply to the plaintiff's argument as it was finally left, and could not claim that their hands were tied, or rather that their mouths were closed, and the court expressly guarded their right to reply and invited its exercise.    The matter of permitting further argument was as the defendant's own counsel said below, "like the presentation of evidence," and the court sometimes will and should, permit a plaintiff, after he has rested, to withdraw his "rest" and introduce further evidence; for a trial is not a mere game, but an endeavor to ascertain relevant facts and apply applicable law in such a way that a true verdict and a just judgment may be arrived at.    So far as the exception relates to the matter of allowing two advocates to participate in the opening argument, it touches a matter of discretion, not often to be exercised, but we cannot say that, in the circumstances, there was an abuse of discretion in that regard.

The court submitted to the jury the question of whether it was the duty of the defendant to install in its plant a dust collecting system.    To this part of the charge the defendant excepted on the ground that there was no evidence tending to show any way in which the air of the mill could have been kept freer from dust than it was unless the defendant stopped doing business, and on the ground that there was no evidence tending

to show that any device is known adapted to the circumstances of the defendant's plant and the business therein carried on. But the description of the defendant's plant and business as already given and the expert testimony tended to show the contrary of these propositions.

The court submitted to the jury the question of whether or not the risk from the dust in the air was a natural incident to the carrying on of the defendant's business in a reasonably careful and prudent manner. To this part of the charge the defendant excepted. And the argument now made in support of the exception is that "the entire record of the trial does not disclose or suggest any manner in which the defendant's business could have been carried on without producing the conditions in regard to dust that were disclosed by the testimony." The question thus raised has already been disposed of.

The court defined an ordinary risk at some length. To this portion of the charge the defendant excepted. With regard to this exception, the defendant, in his brief, merely says that for reasons stated as the grounds of the exception the definition of an ordinary risk was erroneous. Referring to the exceptions we see that the defendant's claim was that the court's definition of an ordinary risk was not applicable to the case, on the ground that an ordinary risk "is a risk that exists by reason of the conduct of the business as it is carried on continuously from day to day, its normal conduct with the way of carrying on the business, and that conduct fully known to the servant when he engages in it." The defendant here uses the word "normal" with reference to one's way of carrying on his business, whether or not his conduct is reasonably careful and prudent, provided it is fully known to an employee who engages in the business. But the defendant's definition of an ordinary risk was not correct, for it introduced an element of an extraordinary risk and the assumption thereof, and the court was right in refusing to embody in its instructions the defendant's claim as to what an ordinary risk is.

The defendant's exception "numbered 53" was taken to that part of the charge which related to the assumption of an extraordinary risk, and this exception is not argued by the.

defendant, who says "that is it fully covered by the motion for a directed verdict," all the grounds of which we have considered.

The defendant excepted to the charge upon the question of damages and to the action of the court in overruling a motion which it made that the verdict of the jury be set aside on the ground of excessive damages. But these two exceptions are expressly waived.

The defendant's exceptions 7, 8, 9, 12, 18, 19, 21, and 22, are not relied on or mentioned in the defendant's brief, and so are treated as waived. All exceptions not waived in one way or another have been considered.

*Judgment affirmed.*